# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| CHRISTOPHER P. FINNERTY, Individually,<br><br>        Plaintiff,<br><br>    vs.<br><br>HOWMEDICA OSTEONICS CORPORATION, A New Jersey corporation, also known as STRYKER ORTHOPEDICS; DOES 1 through 15, inclusive; and ROE BUSINESS ENTITIES 1 through 15, inclusive,<br><br>        Defendants. | Case No.: 2:14-cv-00114-GMN-GWF<br><br>**ORDER** |

Pending before the Court is a Motion for Summary Judgment, (ECF No. 37), filed by Defendant Howmedica Osteonics Corporation ("Defendant").  Plaintiff Christopher P. Finnerty ("Plaintiff") filed a Response, (ECF No. 40), and Defendant filed a Reply, (ECF No. 43).

Also pending before the Court is Plaintiff's Motion for Summary Judgment, (ECF No. 38).  Defendant filed a Response, (ECF No. 39), and Plaintiff filed a Reply, (ECF No. 41).  For the reasons discussed below, Defendant's Motion is **GRANTED in part** and **DENIED in part**, and Plaintiff's Motion is **DENIED**.

## I.    BACKGROUND

This products liability claim case arises out of an alleged failure of a surgical knee replacement product, formally known as the "Global Modular Replacement System" (the "Product"). (Def.'s MSJ, 2:3–5, ECF No. 37); (Pl.'s MSJ 3:27–4:3, ECF No. 38).  In December 2004, Plaintiff was diagnosed with clear cell chondrosarcoma in his left leg and

sought treatment from Dr. Jeffrey Eckardt ("Dr. Eckardt"), an orthopedic oncologist located in California. (*See* Ex. 2 to Def.'s MSJ, ECF No. 37-2).  After discussing treatment options including, *inter alia*, amputation of Plaintiff's left leg, Plaintiff elected to undergo a total knee replacement involving implantation of the Product in the hopes of salvaging his leg. (*See* Ex. 5 to Def.'s MSJ, ECF No. 37-5).

On March 21, 2005, Dr. Eckardt performed the total knee replacement surgery on Plaintiff at UCLA Medical Center in California. (*See* Ex. 5 to Def.'s MSJ); (Pl.'s Resp. 9:8, ECF No. 40).  Dr. Eckardt reconstructed Plaintiff's left knee by replacing the knee with the Product, a "modular Stryker proximal tibia replacement including a kinematic rotating hinge." (*Id.*).  At the time of the surgery, Plaintiff was clinically "obese." (Ex. 2 to Def.'s MSJ).  After the March 2005 surgery and through November 2011, Plaintiff did not experience any pain or instability in the operated knee. (Pl.'s Dep. at 28, Ex. 7 to Def.'s Resp., ECF No. 39-7).

In August 2011, Plaintiff accepted a job with First Transit as a Bus Operator for the McCarran Rent-a-Car Center Shuttle System in Las Vegas, Nevada. (*Id.* at 7).  Plaintiff's job required him to "lift up to 80 pounds of luggage on a repetitive basis." (Ex. 8 to Def.'s MSJ, ECF No. 37-8).  In December 2011, while Plaintiff was lifting luggage onto the bus for passengers, he turned and heard a "pop" in his left knee. (Pl.'s Dep. at 28); (*see also* Ex. 13 to Def.'s MSJ, ECF No. 37-13).  Shortly thereafter, Plaintiff's treating physician, Dr. Ronald Hillock ("Dr. Hillock"), performed a revision surgery on Plaintiff's knee, during which Dr. Hillock discovered that the Product had fractured. (Ex. 13 to Def.'s MSJ); (Hillock Dep. at 21–22, Ex. 7 to Def.'s MSJ, ECF No. 37-7).  Following the revision surgery, Plaintiff began to experience complications. (*See* Hillock Dep. at 22–23).  Ultimately, Plaintiff elected for amputation of his left leg. (Ex. 14 to Def.'s MSJ, ECF No. 37-14).

Based on these facts, Plaintiff asserts claims against Defendant for failure to warn, negligence, strict liability design defect and manufacturing defect, breach of express warranty,

1  and breach of implied warranty. (*See* Am. Compl., ECF No. 14).  Defendant now seeks

2  summary judgment on each of Plaintiff's claims, and Plaintiff seeks summary judgment on his

3  failure-to-warn claim.

## II.   LEGAL STANDARD

5       The Federal Rules of Civil Procedure provide for summary adjudication when the

6  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

7  affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant

8  is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that

9  may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

10  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

11  return a verdict for the nonmoving party. *Id.*  "Summary judgment is inappropriate if

12  reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict

13  in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th

14  Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A

15  principal purpose of summary judgment is "to isolate and dispose of factually unsupported

16  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

17       In determining summary judgment, a court applies a burden-shifting analysis.  "When

18  the party moving for summary judgment would bear the burden of proof at trial, it must come

19  forward with evidence which would entitle it to a directed verdict if the evidence went

20  uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing

21  the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

22  *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In

23  contrast, when the nonmoving party bears the burden of proving the claim or defense, the

24  moving party can meet its burden in two ways: (1) by presenting evidence to negate an

25  essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50.

## II.    <u>DISCUSSION</u>

Plaintiff asserts claims against Defendant for failure to warn, negligence, strict liability design defect and manufacturing defect, breach of express warranty, and breach of implied warranty. (*See* Am. Compl., ECF No. 14).  The Court considers each claim in turn.

### A.     Failure to Warn

Plaintiff seeks summary judgment on his failure-to-warn claim on the basis that "[Defendant] failed to warn about the risks associated with their manufactured knee replacement, and as a result, caused [Plaintiff] and the ensuing need for an amputation." (Pl.'s MSJ 8:24–26, ECF No. 38).  Defendant also seeks summary judgment on this claim, arguing that it provided adequate warnings to Dr. Eckardt regarding the Product. (Def.'s MSJ 7:1–10:8, ECF No. 37).

The Court's analysis on this claim proceeds in two steps.  First, as a preliminary matter, the parties dispute whether California or Nevada law should apply to the failure-to-warn claim. (Def.'s Resp. 3:2–16, ECF No. 39); (Pl.'s Resp. 8:26–10:13, ECF No. 40).  While the action was brought in Nevada, the alleged injury and the underlying conduct giving rise to the injury occurred in California.  Under Nevada's choice of law principles, the Court finds that California law applies to Plaintiff's failure-to-warn claim.[1]  Next, applying California law, the Court grants Defendant's Motion for Summary Judgment on this claim.

#### 1.     *Choice of Law*

##### a.     *Legal Standard*

"A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 582 (2013).  Nevada's choice-of-law jurisprudence in tort actions is governed by the most significant relationship test, as provided by the Restatement (Second) of Conflict of Laws § 145. *Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. County of Clark*, 122 Nev. 466 (2006).  Section 145 provides:

---

[1] Although the parties disagree on what law governs Plaintiff's failure-to-warn claim, the parties agree that Nevada law governs Plaintiff's remaining claims. (*See* Pls.' Resp. 15:5–6, ECF No. 40).  As a result, neither party provides any analysis on whether California law or Nevada law should apply to those claims, and the Court declines to undertake such analysis.  The Court therefore assumes without deciding that Nevada law applies to Plaintiff's remaining claims.

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a) the place where the injury occurred,

    (b) the place where the conduct causing the injury occurred,

    (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

    (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 (1971). These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 145 applies to tort actions "unless another, more specific section of the Second Restatement applies to the particular tort." *Gen. Motors Corp.*, 122 Nev. at 473. The Second Restatement specifically addresses personal injury actions in § 146, providing a modified version of the most significant relationship test. Section 146 of the Second Restatement states:

In an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 146.

The Second Restatement defines "personal injury" as "either physical harm or mental disturbance, such as fright and shock, resulting from physical harm or from threatened physical harm or other injury to oneself or to another." *Id.* § 146 cmt. b. Both § 145 and § 146 incorporate the following principles from § 6:

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Vignola v. Gilman*, 854 F. Supp. 2d 883, 887 (D. Nev. 2012).  These principles are not intended to be exclusive and no one principle is weighed more heavily than another.  Restatement (Second) of Conflict of Laws § 6 (1971).

### b.     Nevada Law Applies to Plaintiff's Failure-to-Warn Claim

After consideration of the factors and principles in the Restatement (Second) of Conflict of Laws §§ 6, 145, and 146, the Court finds that California bears the most significant relationship to Plaintiff's failure-to-warn claim.  The needs of interstate and international systems and the basic policies underlying this particular field of law do not favor Nevada any more than they do California. *See* Restatement (Second) of Conflict of Laws § 6(a), (e).  To the extent that these two factors are applicable here, they are neutral.  Likewise, the relevant policies of Nevada and California neutralize one another.  *See id.* § 6(b), (c).  On the one hand, Nevada has an interest in protecting its citizens, and on the other, California has an equally strong interest in ensuring that surgeries performed within its borders comport with its applicable state laws.  These two factors are therefore neutral.

The protection of justified expectations favors applying California law. *See id.* § 6(d). California has a justified expectation that its tort rules will be applied to conduct related to surgeries occurring in California.  Additionally, entities conducting business in California have a justified expectation they will be held accountable under California tort law.  In contrast, out-of-state visitors do not have a justifiable expectation that they will bring their state's laws with them when they travel.  In situations such as this one, allowing plaintiffs to drag Nevada's failure-to-warn laws with them when they visit another state would, in practice, permit Nevada

to usurp other states' legislatures.  Accordingly, this factor favors the application of California law.

Applying California law to this action also furthers the certainty, predictability, and uniformity of results. *See* Restatement (Second) of Conflict of Laws § 6(f).  Implantation of the alleged defective Product occurred in California, and therefore, California is the place where the injury occurred. *Moses v. Danek Med., Inc.*, No. CV-S-95-512 PMP RLH, 1998 WL 1041279, at *4 (D. Nev. Dec. 11, 1998) ("The place where the injury was suffered is not automatically the place where the injury occurred.").  Moreover, the conduct giving rise to Plaintiff's failure-to-warn claim occurred exclusively in California.  When the conduct and injury occur in one state, common sense dictates that applying that state's law provides certainty, predictability, and uniformity to future incidents whose conduct and injury occur in the same state.  Given the "general rule in section 146 [that] requires the court to apply the law of the state where the injury took place," *Gen. Motors Corp.*, 122 Nev. at 475, this factor favors applying California law.

Finally, while Nevada courts are most familiar with Nevada law, California's tort law, although different, is not particularly complicated or difficult to apply. *See* Restatement (Second) of Conflict of Laws § 6(g).  This factor only slightly favors the application of Nevada law.  In consideration of the foregoing factors, the Court concludes that Nevada does not have a more significant relationship to the failure-to-warn claim which would warrant application of Nevada law.  Accordingly, the Court finds that, with regard to this claim, the rights of Plaintiff and the liability of Defendant are determined by California law.

### 2. *California – Failure to Warn*

The California Supreme Court has held that "[m]anufacturers are strictly liable for injuries caused by their failure to give warning of dangers that were known to the scientific

community at the time they manufactured and distributed the product[.]"[2] *Carlin v. Superior Court*, 920 P.2d 1347, 1348 (Cal. 1996).  In the medical device context, California applies the "learned intermediary" doctrine, which provides that the duty to warn runs to the physician, not the patient. *Id.* at 1360–61.  Thus, a manufacturer discharges its duty to warn if it provides adequate warnings to the physician about any known or reasonably knowable dangerous side effects, regardless of whether the warning reaches the patient. *See, e.g.*, *Stanley v. Novartis Pharm. Corp.*, 11 F. Supp. 3d 987, 1002–03 (C.D. Cal. 2014).  Additionally, "[a] plaintiff asserting causes of action based on a failure to warn must prove not only that no warning was provided or the warning was inadequate, but also that the inadequacy or absence of the warning caused the plaintiff's injury." *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 990–91 (C.D. Cal. 2001), *aff'd sub nom. Motus v. Pfizer Inc. (Roerig Div.)*, 358 F.3d 659 (9th Cir. 2004).

    Defendant's training materials warn that the Product is contraindicated in "overweight or obese patient[s]" and patients whose occupation "includes significant impact loads (walking, running, lifting or twisting)." (Ex. 16 to Def.'s MSJ at 6, 10, ECF No. 37-16).  Although Dr. Eckardt testified at his deposition that he was unaware of this specific literature, (Eckardt Dep. 9:10–13, Ex. 6 to Def.'s MSJ, ECF No. 37-6), Dr. Eckardt was nevertheless aware of unique risks associated with knee replacements in obese patients, and those risks "wouldn't have made any difference" to his decision to attempt to salvage Plaintiff's leg by implanting the Product. (*Id.* 9:10–19).  Indeed, Dr. Eckardt testified that, at the time of Plaintiff's surgery, he was unaware of any other knee replacement system with a higher rate of success than the Product. (*Id.* 10:20–25).  In addition, Dr. Eckardt's notes reflect that he discussed "risk[s] of surgery" with Plaintiff, including possible "failure of the prosthetic mechanism." (Ex. 5 to Def.'s MSJ at

---

[2] Defendants seek summary judgment on Plaintiff's failure-to-warn claim "[w]hether framed as negligence or strict liability." (Def.'s MSJ 8:3).  However, Plaintiff asserts failure to warn only under a theory of strict liability. (*See* Am. Compl. ¶ 27).  Because "[f]ailure to warn in strict liability differs markedly from failure to warn in the negligence context," the Court confines its discussion of this claim to strict liability. *Carlin v. Superior Court*, 920 P.2d 1347, 1351 (Cal. 1996).

2, ECF No. 37-5). Finally, Defendant's Rule 30(b)(6) representative, Daniel Librot, testified that the surgeon, not the device manufacturer, makes the final determination regarding patient selection for the Product. (Librot Dep. 6:13–14, Ex. 5 to Pl.'s MSJ, ECF No. 38-5).

The evidence before the Court demonstrates that Defendant provided warnings to Dr. Eckardt regarding the danger of implanting the Product in an overweight patient, and that Dr. Eckardt decided to proceed despite the risks. California law does not impose an additional duty on a device manufacturer to second guess a practicing physician when that physician has already received the necessary warnings. *See Wendell v. Johnson & Johnson*, C 09-04124 CW, 2012 WL 3042302 (N.D. Cal. July 25, 2012) ("A manufacturer . . . discharges its duty to warn if it provides an adequate warning to the physician about any known or reasonably knowable dangerous side effects of a medicine, regardless of whether the warning reaches the patient.") (citing *Carlin*, 920 P.2d at 1360–61). Further, Plaintiff does not allege that the warnings included with the Product were inadequate. And, given that Dr. Eckardt would have proceeded with the surgery despite the specific warnings, Plaintiff cannot establish causation. *See, e.g.*, *Motus*, 196 F. Supp. 2d at 991 ("A plaintiff asserting causes of action based on a failure to warn must prove not only that no warning was provided or the warning was inadequate, but also that the inadequacy or absence of the warning caused the plaintiff's injury."). Accordingly, the Court grants Defendant's Motion for Summary Judgment with regard to the failure to warn.

### B. Negligence

Plaintiff asserts a claim for negligence against Defendant for "negligently and carelessly designing, manufacturing, testing, researching, assembling, producing, labeling, selling and distributing a defective product." (Am. Compl. ¶ 14, ECF No. 14). Although Defendant's Motion purports to seek summary judgment on this claim, Defendant provides no argument on this point. Instead, Defendant improperly conflates Plaintiff's negligence claim with Plaintiff's failure-to-warn claim. (*See* Def.'s MSJ 7:1–10:8) ("Whether framed as negligence or strict

liability, [Plaintiff's] failure-to-warn claims fail as a matter of law[.]").  As a result, summary judgment on this claim is denied. *See* L.R. 7-2(d) ("The failure of a moving party to file points and authorities in support of the motion constitutes a consent to the denial of the motion.").

### C.    Strict Liability – Design Defect and Manufacturing Defect

The Nevada Supreme Court has extended an action for strict liability in tort to all products. *See Ginnis v. Mapes Hotel Corp.*, 470 P.2d 135, 138 (Nev. 1970).  A strict products liability action requires a plaintiff to establish: (1) defendant placed a defective product on the market; (2) the defect caused plaintiff's injury; and (3) the defect existed when the product left the hands of defendant. *See Allison v. Merck & Co.*, 878 P.2d 948, 952 (Nev. 1994).  A product is defective when it is "dangerous because [it] fail[s] to perform in the manner reasonably expected in light of [its] nature and intended function." *Id.*; *see also Phillips v. C.R. Bard, Inc.*, No. 3:12-cv-00344-RCJ, 2014 WL 7177256, at *8 (D. Nev. Dec. 16, 2014) ("[T]he Allison opinion makes clear that the Nevada Supreme Court does not particularly care whether [a defect] is characterized as a manufacturing defect or a design defect.").  The defect must also be "unreasonably dangerous." *See Lewis v. Sea Ray Boats, Inc.*, 65 P.3d 245, 249 (Nev. 2003).

"In strict product liability cases, the plaintiff carries both the burden of production and the burden of persuasion." *Id.*  To prove proximate cause in a strict products liability action in Nevada, "the plaintiff must show that the design defect in the product was a substantial factor in causing his injury." *Price v. Blaine Kern Artista, Inc.*, 893 P.2d 367, 370 (Nev. 1995).  "A plaintiff need not 'produce direct evidence of a specific product defect [or] negate any alternative causes of the accident.'" *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010) (citing *Stackiewicz v. Nissan Motor Corp.*, 686 P.2d 925, 927 (Nev. 1984)).  "An 'unexpected, dangerous malfunction' suffices." *Id.* (citing *Stackiewicz*, 686 P.2d at 928).

In the present case, therefore, Plaintiff may establish a defect by proving that the failure

of the Product caused his harm.[3] *See Allison*, 878 P.2d at 952 ("[P]roducts are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function.").  Plaintiff's biomechanical engineering experts, Dr. Mari Truman ("Dr. Truman") and Dr. Robert Chasnov ("Dr. Chasnov"), both concluded that the Product suffered from both manufacturing and design defects.  Dr. Truman stated in her report that the "manufacturing" of the Product was "sub-optimal." (Ex. 5 to Pl.'s Resp. at 41, ECF No. 40-5).  According to Dr. Truman, "under repetitive loading[,] multiple cracks initiated" in the Product and "propagated upon further cycling loading." (*Id.*).  Dr. Truman determined the Product was "defective due to these deficiencies," which "caused . . . the premature failure" of the Product. (*Id.*).  Likewise, Dr. Chasnov concluded that "the femoral component of the [Product] was defective because it was simply cast without additional processing" resulting in "fairly-large grained, brittle implant which was highly susceptible to fatigue crack growth." (Ex. 6 to Pl.'s Resp. at 8, ECF No. 40-6).

In contrast, Defendant's metallurgical engineering expert, David A. Moore ("Moore"), noted that his "investigation into the fracture and metallurgical characteristics of the [Product's] femoral component show that it was sound, high quality, and met . . . standard requirements." (Ex. 17 to Def.'s MSJ at 29, ECF No. 37-17).  Moore further concluded that the "fatigue fractures were not caused by any porosity, casting defects, brittleness, or distal augmentation holes[.]" (*Id.*).  In addition, Defendant's medical expert, Dr. Earl W. Brien, an orthopedic

---

[3] Causation can be proved in Nevada under a but-for theory or under a "substantial factor" theory.  *See Wyeth v. Rowett*, 244 P.3d 765, 778 (Nev. 2010).  The Nevada Supreme Court has explained that:

> A but-for causation instruction applies when each party argued its own theory of causation, the two theories were presented as mutually exclusive, and the cause of the plaintiff's injuries could only be the result of one of those theories, but not both.  *Johnson v. Egtedar*, 112 Nev. 428, 436, 915 P.2d 271, 276 (1996).  A substantial-factor causation instruction is appropriate when "an injury may have had two causes, either of which, operating alone, would have been sufficient to cause the injury." *Id.* at 435, 915 P.2d at 275–76.

*Id.*

surgeon, opined in his report that "the combination of [Plaintiff's] weight, the stress placed on the implant related to [Plaintiff's] age and job and the fact that he was moving luggage at the time of the implant fracture . . . was the etiology to the implant fracture." (Ex. 19 to Def.'s MSJ at 10, ECF No. 37-19).

In light of the contradictory evidence submitted by the parties, the Court finds that a genuine issue of material fact remains regarding whether a defect in the Product caused Plaintiff's injury. Even if Plaintiff were to admit, as Defendant argues, that Plaintiff's weight and occupational activities weakened the Product, a jury could still find that poor design was a substantial factor in causing Plaintiff's injury. The Court therefore cannot find at this stage that the substantial factor theory will not be supported by the trial evidence, even assuming Defendant could prove that other factors weakened the Product, which is disputed. At this stage, the evidence would appear to support alternative causation instructions under either theory. Accordingly, the Court denies summary judgment on Plaintiff's defect claims.

### D.  Breach of Express Warranty

"Under Nevada law, only sellers of products can provide express and implied warranties." *Baymiller v. Ranbaxy Pharm., Inc.*, 894 F. Supp. 2d 1302, 1310 (D. Nev. 2012). "Express warranties by the seller are created [by] . . . [a]ny affirmation of fact or promise . . . which relates to the goods and *becomes part of the basis of the bargain*." *Allied Fid. Ins. Co. v. Pico*, 656 P.2d 849, 850 (Nev. 1983); *see also* Nev. Rev. Stat. § 104.2313. Defendant argues that "there is no evidence that [it] made 'an affirmation of fact or promise' to [Plaintiff]" as required by Nevada Revised Statutes § 104.2313. (Def.'s MSJ 15:2–3). Plaintiff does not address Defendant's argument in his response. In light of the absence of any evidence of an affirmation or a promise that could have formed a basis for the bargain, the Court grants summary judgment on Plaintiff's claim for breach of express warranty.

### E.      Breach of Implied Warranty

In Nevada, there are two types of implied warranties: (1) warranty of fitness for a particular purpose; and (2) warranty of merchantability. *Long v. Flanigan Warehouse Co.*, 382 P.2d 399, 402 (Nev. 1963).  For either claim of implied warranty, Nevada case law requires contractual privity between the buyer and seller. *Id.* at 402–03 ("[S]ome recent decisions have declared that lack of privity is not a defense to a claim based upon breach of implied warranty . . . . We decline to follow their reasoning.").  Defendant argues that summary judgment on this claim because no contractual privity exists between Plaintiff and Defendant. (Def.'s MSJ at 15:8–19).  As with Plaintiff's breach of express warranty claim, Plaintiff failed to respond to Defendant's argument on this point or present any evidence demonstrating privity. Accordingly, the Court grants Defendant's Motion with respect to this claim.

### III.    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 38), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 37), is **GRANTED in part** and **DENIED in part**.  Plaintiff's claims for failure to warn, breach of express warranty, and breach of implied warranties are **DISMISSED**.  Plaintiff's remaining claims for negligence, strict liability design defect, and strict liability manufacturing defect survive.

**DATED** this __12__ day of September, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Judge